Our first argument this morning is 18-6107, Dental Dynamics v. Jolly Dental Group. Mr. Billings? Good morning, Your Honor. May it please the court. My name is Wayne Billings and I represent the appellant, Dental Dynamics. I would like to reserve two minutes of time for rebuttal and I'll do my best to stick to that. This case arises out of the purchase and sale of a dental x-ray machine. The issue being personal jurisdiction. I will highlight the relevant jurisdictional facts. The first of which is that Dental Dynamics, my client, is an Oklahoma broker of pre-owned dental machines, predominantly x-ray machines and other imaging devices. The practice are Arkansas citizens and I will refer to them just collectively as Dr. Jolly. The first crucial fact, and a fact I believe the district court failed to account for, is that there was an ongoing existing business relationship between Dental Dynamics in Oklahoma and Dr. Jolly in Arkansas since at least 2008. Well, had there ever been a prior transaction between the two companies? The affidavit that Dental Dynamics submitted referred to several, at least potential, transactions. There have been contacts, but there have never actually been a piece of equipment brokered for sale, correct? I don't know that that's accurate, but suffice it to say the record does not show an actual transaction. There were several contemplated transactions. A lot of communications. The district court did not... And that's, I mean, the three inquiries and the one transaction, I guess, that arose from the inquiries, that's our universe of determining whether there's an ongoing business relationship. If I understand the court's question... Is there anything else? I'm not aware of anything in the record that would establish, other than those contacts, that would establish an existing, ongoing relationship. But again, that fact was the existence of that relationship was testified to in an affidavit. The district court was required to accept as true that affidavit and the existence of that relationship. But that relationship does not appear anywhere in the district court's ruling. In fact, the district court actually goes the other way and finds that there was no existing relationship. Now, an ongoing relationship, right? You're trying to come in under Burger King, I take it? I believe that Burger King does weigh in our favor on this. The district court's actual word was pre-existing relationship prior to the transaction at issue. Let me ask you this. When this particular sale of equipment was finished, was there anything left to be done between the parties as a result of this transaction? Any ongoing business relationship or responsibilities? Well, I would argue that the major problems that arose in this transaction did create an ongoing aspect to it. But had the transaction just simply been buy and sell and everything's fine, then that transaction would have been concluded. The relationship would have continued to exist between them. But yes, that would have concluded this particular contact. Now, I would submit that this particular contact was the latest in an ongoing series. And those were the facts before the district court, which the district court was required to construe or to accept. And any disputes on those facts had to be resolved in favor of dental dynamics, in favor of finding personal jurisdiction. Are you contending that those three sporadic episodes are sufficient in every case? Or is there something particular about this case that makes them sufficient? I don't think the personal jurisdiction inquiry really lends itself to bright line rules that apply in every case. And so I would say that in these particular circumstances, again, given that this is dental x-ray machines, we're not talking about a large market. It's a very specific market and nationwide. One of the benefits that dental dynamics brings to its clients is a network of contacts, a good reputation, knowing who needs to sell and who needs to buy, and putting the two together in a mutually beneficial way. So under these circumstances, the way I see relationships and transactions in this context would be on the scale of one end, would be the Burger King, the Dudnikoff ongoing express agency or franchisee type relationship. That would absolutely be a relationship sufficient to warrant personal jurisdiction. At the other end would be like an Amazon.com purchase. The product is available to sale for the whole world at large. It's a complete stranger's. There's really no communication. It's a point and click and the transaction's finished. Now, if I buy something from Amazon.com, that obviously doesn't subject me to personal jurisdiction in Washington, where Amazon's principal place of business is. The transaction we have here is very much the potential seller reaches out to a broker, a known broker, and says, I need you to find me a buyer because this is a very specific market, a very specific thing that's being sold. Let me interrupt you for a minute. You have a claim against Jolly Dental for breach of contract, but your claim against Dr. Jolly is for fraud. Does our analysis of minimum contacts change depending on whether we're looking at a fraud claim or a breach of contract claim? I believe the case law does support a distinction between those two analyses. And you kind of lump them together, but it really is a different test, isn't it? It is. It is. I think the fraud side is more directed toward purposeful availment and a specific targeting of a victim. And on the fraud side, I think the key fact that the district court failed to account for is that Dental Dynamics actually bought the machine from Dr. Jolly. So title came to Dental Dynamics in Oklahoma. Dental Dynamics then sold it to California, but in finding that the brunt of the harm would be felt in California, in finding that the conduct was expressly aimed at California, there's actually no support in the record for that fact because the record does not show that Dr. Jolly, at the time he made the fraudulent misrepresentations, ever even knew that the California buyer, Dr. Joiner, existed, who it was. All he was dealing with was Dental Dynamics. But he knew that the defective equipment was not going to be shipped to Dental Dynamics. He knew that defective equipment was going to be shipped to some poor dentist out there somewhere. Out there somewhere, yes. And that person would suffer the injury. That person would suffer a injury. But the person that he had to fool was Dental Dynamics in Oklahoma. Because it could be an Oklahoma dentist, it could be an Alaskan dentist. His expressly directed conduct was aimed at Dental Dynamics in Oklahoma. That was his direct buyer. In order to pull this sale off, that's who he had to fool. And that's who he did fool. And that's the purposeful availment, the specific directing of tortious conduct toward an Oklahoma resident. While that resident was in Oklahoma. That gives the district court jurisdiction over Dr. Jolly's own fraud claims. If your client were a broker of, say, farm implements, threshers, and we had three transactions over a 10-year period, same faxes here more or less, do you think there would be personal jurisdiction over the Oklahoma rancher that used your client as a broker? I think there would be personal jurisdiction, if I'm understanding the factual scenario correctly. Somewhere between Burger King and Amazon.com. Yes, I do think that's where that falls. And that gets to the random fortuitous attenuated contacts analysis. I think it's very specific to the facts and the types of communications, the types of transactions. What's interesting about this transaction, and I think it would be the same with the farm implements example, is that when the seller contacts the broker and says, find me a buyer, that's a process that could take days, weeks, months, because the broker then has to go make use of his or her resources and contacts, go find a buyer. And we'll be working on behalf of that seller for that. How do you distinguish Walden versus Fiori then, which suggests, as I read it, that it cannot be only the plaintiff's connection with the farm state, that there has to be something more? It has to be the defendant's conduct. Right. Yes. And I think that is an important point. In this case, it was Dr. Jolly who intentionally initiated the contact that gave rise to this transaction. He also, at the same time, initiated a transaction that didn't end up happening and is not at issue in this case. It's Dr. Jolly reaching out to his longtime point of contact in Oklahoma and asking to find him a buyer for this specific device. Now, I think that conduct, it's not an agency relationship, so it's different from Dudnikoff in that sense. But I think the relationship here is a lot more like that than it would be an Amazon.com transaction, because it is the defendant reaching out to an Oklahoma broker saying, find me a buyer, however long that would take. And the record's not clear on exactly how long it did take in this case. But that's an ongoing relationship at that point. Well, I use Amazon.com quite a lot to purchase things. So I reach out to them on a regular basis looking for various products. And they do the legwork of gathering various vendors of those products. And then they send it to me in Utah. Am I, under your argument, why wouldn't I be subject to being hailed into court in the state where any of those vendors are located, or where Amazon.com is located? Well, because under that scenario, there would be, basically, it's the nature of- Ongoing relationship. It's been going on for a decade now. And I reach out to them every time. Yes, and I do understand that. Now, when you have a specific product in mind that you're going to go buy, and you go to Amazon.com, and you find it, you don't know where that's coming from, number one. It could be Amazon.com selling it. It could be some other seller in the marketplace. They're acting as a broker, right? Well, they're acting as the marketplace, frankly. And that's different from this situation, because you're not asking Amazon to go make use of its contacts and find a buyer. You're already coming, knowing what you want, knowing in an established marketplace. It's like going to Walmart, just a lot more convenient. You're coming with your own requirements in mind. But we focus on the contacts of the defendant with the foreign state. And you're saying, we can look at the fact that Dr. Jolly reached out and contacted your client in Oklahoma. And because back in 2008, Dr. Jolly also contacted your client, that therefore, we can say that he's purposely availed himself of the benefits of doing business in Oklahoma, and he can be sued there. I'm having a hard time seeing what the difference is for me reaching out and taking repeatedly to Amazon to use the benefits of what they can provide to me. How is it different? Well, and I think this is a good example of the differences in the relationships. For instance, here, you have a longstanding, as stated in the affidavit, and the affidavit's not completely clear, but you have the course of communication, the specific back and forth over time. I bet you my contacts with Amazon beat that affidavit substantially. I would bet that's true for most of us, Your Honor. Yeah, I know you want to reserve some time, but quickly, if we agree with you that they're minimum contacts, is that the end of the story, or is there a separate inquiry on whether there's notions of fair play, due process have been met? That is the next step. And I believe that one of the cases that the appellee cites in its brief, Mosca, it's an Oklahoma court, an unpublished decision, but it's very similar on the fairness analysis. And basically, those five factors are essentially neutral. There's really no inconvenience that would heavily outweigh one party or another, Arkansas versus Oklahoma. All right. Thank you, counsel. Good morning. May it please the court. My name is George Friedman, along with my co-counsel, Lance Phillips. We represent Jolly Dental Group and Dr. Scott Jolly. I think your questions hit the nail on the head. This is a one-time sale of a product that never entered the forum state of Oklahoma. It was sold in Arkansas, packaged in Arkansas, shipped to California, paid for by a California resident. With money that was passed through Oklahoma into Arkansas. Well, Dr. Jolly signed a bill of sale that included a representation of fitness for the purpose that would be an ongoing obligation that he then emailed back to Oklahoma. Did that create an ongoing responsibility? Not as defined by the Supreme Court in Burger King. In Burger King, if you remember, that's a franchise agreement that was 20 years in duration. 20 years of working between the franchisor in Florida and the franchisee in Michigan. And if I remember right, it was 10 years into that relationship that the litigation started because the franchisee stopped paying. And that's the ongoing relationship that justifies jurisdiction. We don't have that here. We have the situation like J. McIntyre Machinery, where Justice Kennedy told us that there's never been a situation where it's a one-time sale of a product that comports to converse jurisdiction to the forum state. So this case is much more like J. McIntyre Machinery than it is- More than a single contract, because there was an inquiry that was quite dated, but there was a transaction that was almost completed. It went down to the wires, I interpreted, and then it fell apart. But within a few months, same year as this transaction, why doesn't that bump this up out of McIntyre? Because it's still a fortuitous, I think Judge Phillips used the term, sporadic contact. We have a 2008 initial inquiry about the sale of a product that turned out to be obsolete, according to the broker, and it never happened. This sale, I think, was in 2017, so we have a break of nine years. That's the very definition of fortuitous-type contacts. So it's not an ongoing relationship like the kind in Burger King. It's really a sporadic, fortuitous-type contact. And if we agreed with you, that would take care of Jolly Dental, the company, but it's a fraud claim against Dr. Jolly. So wouldn't we apply, then, the Calder effects test in terms of minimum contacts for Dr. Jolly? And I appreciate that. I think that we look at Calder, we look at Dudenkopf, but then we also look at Walden. And then we look at the most recent case from this circuit, C5 Medical Works, which was just cited two weeks ago. Those cases, Walden and C5 Medical Works, looked at the fact that it was just the plaintiff that was the contact with the forum state. It wasn't defendant's contact with the forum state. It was the defendant's contact with the plaintiff, and fortuitously, the plaintiff happened to be in the forum state. So in Walden, you have people traveling by airplane into Atlanta that are Nevada residents. And the Nevada residents happened to have a bunch of cash on them, and they were detained at the Atlanta airport. And the Atlanta officer seized the money knowing that they were Nevada residents, just like here. We knew that the broker was an Oklahoma resident. That's the only contact, that we knew they were Oklahoma residents. We never came here. We never sold the product here. None of those things. And so only the fact that the Georgia police officer knew that these were Nevada residents wasn't enough to confer jurisdiction in Nevada, even though they seized the money, and they knew they were Nevada residents, and the Nevada residents were returning to Nevada without their money, and they wanted their money. So that took it out of the Calder analysis. In Dudikoff, we did find fraud jurisdiction. Right. And remember, Dudikoff, first of all, was decided before Walden. It was decided in 2008. Walden was in 2014. And I think that the C-5 medical works case did a good job of comparing Walden to Calder. And of course, in Calder, you had a different situation. You had a reputational tort. You had a situation where the California resident was defamed in a newspaper article written by Florida residents, and it was using California witnesses, California sources, and the reputation was heard in California. And the authors knew that, and the authors used the California sources. And because it was a reputational tort, which is the language I believe the Supreme Court used, that's why they were allowed to be sued in California. I think another factor in Calder is the fact that the periodical itself, the National Enquirer, they were for sure going to be subject to jurisdiction in California, because they had, what, six times the circulation in California than any other state in the country. So they knew they were going to be there, and so you had the authors also subject to jurisdiction there. But I think that Walden did a good job of distinguishing Calder, and Walden is much more like the facts that we have here. And so I think that the failure of the jurisdiction here is because the only contact with Oklahoma is the plaintiff. It's not defendant purposely availing themselves of the jurisdiction of Oklahoma. And although not dispositive, I think we need to keep in mind the fact that Arkansas law is going to apply to this case. It's not going to be Oklahoma law. Well, that's kind of unclear, too, because the choice of law in Oklahoma is different for contract than it is for tort, right? That's fair. That's fair. It's certainly going to apply for the contract claim. Well, where was this contract made? Oklahoma law, section 162, title 15, says that the law of where the contract was performed is where the law is going to be applied. Well, and of course, there's activity that occurred in either place. The bill of sale was drafted in Oklahoma. It was signed in Arkansas. Then it was emailed back to Oklahoma. So, I mean, there's activity that went on in both states. And then what about tort? What about the fraud claim? What law would apply to that? And I'll be honest with you, Judge. I have not looked at whether the tort law of Oklahoma or the tort law of Arkansas would apply. I would submit to you that in addition to the fact that it was executed in Arkansas, the property was packaged and shipped from Arkansas to California, never entering Oklahoma. And I think that would be dispositive on at least the contract claim on whether or not Oklahoma or Arkansas law would apply. And again, I concede that the choice of law is not dispositive for personal jurisdiction. And I think that's pretty clear. But it's certainly helpful. It's an element that we would look at in terms of the notions of fairness prong of our analysis, right? Yes, exactly. And I think, touching on that point, just jumping around a little bit, we look at the sliding scale for whether or not we get to the notions of fairness. And the limited level of contacts that were at issue here in both the tort claim and the contract claim means that the burden on my client on traditional notions of fair play are lessened than if there were substantial contacts. And I think that's key as well. Wasn't the brunt of the injury, though, on the fraud side directed to and occurred in Oklahoma? I don't believe so, Judge. The brunt of the injury was felt by the California resident that paid the money for this machine. Well, there was no harm in California, ultimately. I'm not. Dr. Joiner was made whole. Dental Dynamics was the entity that suffered the financial harm. I think that's, honestly, I think that's speculation. I don't know the record reflects that Dr. Joiner was made whole. And I could be wrong about that. But that's where the product was shipped to. He's the one who, Dr. Joiner was the one who received the product and had to deal with the fact that it was faulty. Of course, all that's being alleged. And we haven't actually tried those facts, but we have to assume them to be true for jurisdictional purposes. But to that point, shouldn't it be where the brunt of the injury is ultimately determined, ultimately found that measures that, as opposed to where the injury is first felt but later cured? I think the inquiry is that the injuries must arise out of the forum-related conduct. And that's where I think the test fails on the fraud claim. The injury doesn't arise from the forum-related conduct. It arises only fortuitously because the plaintiff happens to be in Oklahoma. And the test is that my client's conduct has to be expressly aimed at the forum state. And his conduct wasn't expressly aimed at the forum state. If, again, it's true, it was aimed at wherever the final product was going to end up. It's the mind of the defendant that's at issue, not necessarily the ultimate brunt of the injury. And again, I think this case follows directly with the Walden analysis. No part of defendant's conduct occurred in the forum state. That was the holding in Walden because, again, these are Georgia residents who are acting on Nevada residents, knowing they're Nevada residents. There wasn't any doubt they had their ID and everything, knowing the harm would be felt by these Nevada residents in Nevada by not having their money. I don't think it's different in this case. Well, the difference is that here your client reached out to Dental Dynamics knowing that they were located in Oklahoma, and then they sent e-mails and assigned a bill of sale and conducted business between Arkansas and Oklahoma. There's none of that in Walden. There's zero connection of any kind in Walden between the officers that searched them in, I think, the Georgia airport and Nevada. Well, so let's look at the C-5 medical works case that was just decided two weeks ago. That was a patent infringement case. A German company sought to stop a Colorado resident from using a product that was allegedly infringing on its patent. In that case, that German company came to Colorado on three different occasions to market the product. And the trial court found that there was personal jurisdiction because the German company attended these conferences and had sent a cease and desist letter directly to the Colorado resident. But the court here relied on Walden and found that the defendant's conduct occurred entirely outside of Colorado, and the mere fact that C-5 was in Colorado, which was known to the defendant, is not sufficient. And I think that helps address the fact that Walden is what's scrolling here, not Calder. Well, in C-5, the contacts with the state of Colorado had nothing to do with the claim. They weren't related. Here, you have the claim arising out of your clients reaching in to Oklahoma to do business with an Oklahoma company. Do you see that as a significant difference? I do not, in the analysis and looking at the litany cases. I mean, let's not forget, Calder was decided in 1983. Dudenkopf relied on Calder in 2008. And then Walden was decided in 2014. There's a progression of looking at the fortuitousness of the plaintiff in the forum state that I think exists here, and I think C-5 got it right, that that was the only issue that was, the only contact was the fact that the plaintiff was here. And, you know, the German company sent a cease and desist letter into Colorado. And I think it's significant that this court in C-5 reversed a trial because the trial court said there was jurisdiction, had a trial, and then this court found no personal jurisdiction and reversed it, and now the trial's got to be somewhere else. I think that's significant. I thank you for your time. Thank you, counsel. Your time's expired. We have a little bit of rebuttal for Mr. Billings. All right, Your Honor, with 32 seconds left, I will be brief. I'll give you 60. Okay, thank you very much. I want to emphasize the standard of decision that the trial court had to follow, and that is facts being accepted as true in favor of dental dynamics and any factual disputes being resolved in favor of dental dynamics. There is no evidence in the record that this was a sporadic relationship. There is no affidavit from Dr. Jolly saying we only did X, Y, or Z deal or we only had these communications. All of that is purely argument of counsel. So applying the proper standard of decision for the trial court, those facts in that affidavit have to be taken as true, and because the trial court's ruling was directly opposed to the facts that had to be taken as true, the decision has to be reversed. As to purposeful availment, the representations, again, at the time the representations were made, they were made only to dental dynamics in Oklahoma. That is purposeful direction of fraudulent conduct. Thank you very much, Your Honor. Thank you, counsel. We appreciate your clear arguments. Your excuse in the case shall be submitted.